**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ST. JOHNS RIVERKEEPER, INC.,

        Plaintiff,

-vs-                                  Case No. 3:07-cv-739-J-34TEM

JACKSONVILLE ELECTRIC AUTHORITY,

        Defendant.

_____/

THE PUBLIC TRUST ENVIRONMENTAL
LAW INSTITUTE OF FLORIDA, INC.,

        Plaintiff,

-vs-                                  Case No. 3:07-cv-747-J-34MCR

JACKSONVILLE ELECTRIC AUTHORITY,

        Defendant.

_____/

## <u>ORDER</u>[1]

    **THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment and

Memorandum in Support Thereof, (Doc. No. 9)[2], and Defendant's Motion for Summary

Judgment and Memorandum in Support Thereof (Doc. No. 15, Case No. 3:07-cv-747-J-

---

[1]    This is a "written opinion" under § 205(a)(5) of the E-Government Act and therefore is available electronically. However, it has been entered only to decide the motions addressed herein and is not intended for official publication or to serve as precedent.

[2]    On August 20, 2008, the Court entered an Order consolidating case numbers 3:07-cv-739-J-34TEM and 3:07-cv-747-J-34MCR. <u>See</u> Order (Doc. No. 19). Unless otherwise indicated, docket citations in this Order refer to the docket in case number 3:07-cv-739-J-34TEM.

34MCR), each filed on March 31, 2008 (collectively Defendant's Motion),[3] as well as Plaintiffs' Joint Motion for Summary Judgment and Memorandum in Support Thereof (Doc. No. 32; Plaintiffs' Motion), filed on April 13, 2008.

On August 13, 2007, St. Johns Riverkeeper, Inc. (Riverkeeper) initiated a citizen's suit under § 505 of the Federal Water Pollution Control Act, commonly known as the Clean Water Act (CWA), 33 U.S.C. § 1365(a). See Complaint (Doc. No. 1; Riverkeeper Complaint). Riverkeeper's two-count Complaint against the Jacksonville Electric Authority (JEA or Defendant), alleges violations of the CWA with regard to more than 200 instances of unauthorized discharges of untreated wastewater, or sanitary sewer overflows (SSOs), at various locations associated with two of JEA's wastewater treatment facilities, the Buckman Wastewater Treatment Facility (Buckman System) and the Arlington East Wastewater Treatment Facility (Arlington East System). Two days after Riverkeeper filed suit, the Public Trust Environmental Law Institute of Florida, Inc. (Public Trust), filed a similar CWA citizen suit against JEA, see Doc. No. 1 (Case No. 3:07-cv-747-J-34MCR), which it subsequently amended to allege CWA violations with respect to the same SSOs identified in the Riverkeeper Complaint. See Amended Complaint (Doc. No. 9, Case No. 3:07-cv-747-J-34MCR; Public Trust Complaint).[4] Recognizing that the parallel citizen suits were predicated

---

[3]     Defendant's summary judgment motions are substantively identical. Unless otherwise indicated, page citations in this Order refer to the motion filed in case number 3:07-cv-739-J-34TEM.

[4]     Specifically, Plaintiffs allege 110 Buckman System SSOs, identified in the Public Trust Complaint as B-1 through B-110, see Public Trust Complaint at 5-9, and ninety-five Arlington East System SSOs, identified as A-1 through A-97, with A-22 and A-63 omitted, in the Public Trust Complaint. See id. at 10-15.

on the same underlying conduct and presented common questions of law and fact, on August 28, 2008, the Court entered an Order consolidating the cases. See Order (Doc. No. 19).

In Defendant's Motion, Defendant requests that this Court enter summary judgment in its favor as to all of Plaintiffs' claims pursuant to Rule 56, Federal Rules of Civil Procedure (Rule(s)). See generally Defendant's Motion. Defendant contends that the Court lacks subject matter jurisdiction over this action because Plaintiffs' claims are moot, see id. at 7-10,[5] or, alternatively, that Plaintiffs' citizen suits are barred by diligent state administrative prosecution, see id. at 11-21. In support of Defendant's Motion, Defendant filed declarations by Scott Kelly, vice president of water/wastewater systems for JEA; Charles Ziegmont, compliance evaluation section administrator for the wastewater program of the Florida Department of Environmental Protection (FDEP); and Gregory Strong, district director for FDEP's northeast district office. See Declaration of Scott D. Kelly, attached as Exhibit A to Defendant's Motion (Kelly Declaration); Declaration of Charles Ziegmont, attached as Exhibit B to Defendant's Motion (Ziegmont Declaration); Declaration of Gregory J. Strong, attached as Exhibit C to Defendant's Motion (Strong Declaration). In their joint response, Plaintiffs oppose Defendant's Motion, arguing that subject matter jurisdiction is proper and summary judgment in Defendant's favor is not warranted. See generally Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 21; Plaintiffs' Response). In support of their arguments, Plaintiffs filed Kelly's deposition transcript. See Deposition of Scott Kelly, attached to Plaintiffs' Notice of Filing Deposition of Scott Kelly (Doc. No. 20; Kelly

---

[5]     Defendant's mootness argument is applicable to all of the alleged SSOs except for those occurring at 10477 Bradley Road and at 3254 Townsend Boulevard. See Defendant's Motion at 3 n.5. It argues that the SSOs occurring at these remaining two locations are subject to summary judgment on alternative grounds. See id. at 21-22.

Deposition).  After first obtaining leave of Court, Defendant filed a limited reply to Plaintiffs' Response, <u>see</u> Reply to Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 25; Reply), to which it attached a declaration from Athena Mann, JEA's vice president of environmental services, <u>see</u> Declaration of Athena Mann, attached as Exhibit A to Reply (Mann Declaration).

In Plaintiffs' Motion, Plaintiffs move for summary judgement as to liability with respect to ninety-six of the SSOs alleged in the Complaints and as to six of Defendant's nine affirmative defenses.  <u>See</u> Plaintiffs' Motion at 1-2.  The arguments set forth in Plaintiffs' Motion substantially overlap those issues raised in Defendant's Motion, although Plaintiffs also present new issues with regard to pre-suit notice and statute of limitations.  <u>See</u> <u>id.</u> at 2. Defendant opposes Plaintiffs' Motion. <u>See generally</u> Defendant's Response in Opposition to Plaintiffs' Joint Motion for Summary Judgment and Memorandum in Support (Doc. No. 35; Defendant's Response).   The parties have filed numerous declarations, deposition transcripts, and other documents in support of their respective positions.  The issues in the Motions are fully briefed and ripe for resolution.

## I.    BACKGROUND

In 1997, the City of Jacksonville water and sewer department, which was responsible for the municipal sewer service for the Jacksonville area, merged with the Jacksonville Electric Authority, which at that time was responsible for the electric utilities for the city, to create JEA.  <u>See</u> Kelly Declaration at 2.  JEA operates and maintains several wastewater treatment facilities, including the Buckman System and the Arlington East System, which include "collection and transmission pipes that carry wastewater from the homes and

businesses of JEA's customers to the plant where it is treated before being conveyed to be discharged to surface water bodies or reused as treated effluent." Ziegmont Declaration at 1-2. JEA operates such facilities pursuant to permits issued by the FDEP pursuant to the National Pollutant Discharge Elimination System (NPDES).[6] The facilities are responsible for "properly maintain[ing] the collection and piping system to convey wastewater to the plants without releasing it to the environment before it has been treated" and "convey[ing] the treated wastewater to approved disposal locations." See Ziegmont Declaration at 2. While "FDEP does recognize that many SSOs are unintentional and are often beyond the control of" JEA, all unplanned wastewater discharges from a treatment facility and all unplanned discharges during transport of wastewater from the treatment facility to the discharge center must be reported to FDEP. See Ziegmont Declaration at 2-3.

The JEA wastewater collection and treatment system handles approximately 80 million gallons of raw sewage daily and consists of "over 3,400 miles of sewer mains, more than 1,165 lift stations (used to pump waste to treatment facilities), over 44,000 manholes and 15 wastewater treatment plants." See Kelly Declaration at 2-3. Among the longest systems in Florida, the Buckman and Arlington East Systems together extend for more than 1,700 miles. See Strong Declaration at 3.

Although JEA has invested substantial resources into improving its wastewater treatment system, and has earned state and national recognition for the operation and

---

[6] As explained below, the CWA bans the discharge of any pollutant without a permit under the NPDES. See Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC, 548 F.3d 986, 989 (11th Cir. 2008). JEA operates each of its numerous water reclamation facilities under a separate permit through the FDEP. See Strong Declaration at 2; see also December 2006 Consent Order, Attachment 9 to Kelly Declaration at ¶ 3, Table 1.

maintenance of its facilities, it has still experienced various unauthorized discharges of untreated wastewater, or SSOs. <u>See</u> Kelly Declaration at 3-5. SSOs vary as to location, volume, impact on the environment, and cause. <u>See</u> <u>id.</u> at 5. Causes include inadequate slope of the pipes or mains; pipe blockages due to build up of fats, oils, and grease; third-party damage; vandalism; and extraordinary weather events or "Acts of God." <u>See</u> <u>id.</u>; Kelly Deposition at 29-30. In JEA's system, the primary cause of SSOs appears to be inadequate slope. <u>See</u> Kelly Deposition at 29-31. JEA reports SSO events to FDEP's Northeast District Office, which is aware of the incidents identified in the Complaints. <u>See</u> Strong Declaration 3.

Defendant has paid penalties for various SSOs pursuant to four administrative consent orders[7] with FDEP—OGC case numbers 02-1707,[8] 02-933,[9] 05-2759,[10] and 06-1769.[11] Viewing JEA to be in violation of the CWA and federal and state enforcement to be inadequate, Plaintiffs each sent notice of their intent to initiate suit under the CWA. <u>See</u>

---

[7] The details and ramifications of these administrative consent orders are discussed more specifically below.

[8] The consent order corresponding to OGC case number 02-1707 was issued in October 2002 and is attached as Exhibit 5 to the Kelly Declaration. The Court refers to this consent order as the October 2002 Consent Order.

[9] The consent order corresponding to OGC case number 02-933 was issued in February 2005 and is attached as Exhibit 6 to the Kelly Declaration. The Court refers to this consent order as the February 2005 Consent Order.

[10] The consent order corresponding to OGC case number 05-2759 was issued in February 2006 and is attached as Exhibit 7 to the Kelly Declaration. The Court refers to this consent order as the February 2006 Consent Order.

[11] The consent order corresponding to OGC case number 06-1769 was issued in December 2006 and is attached as Exhibit 9 to the Kelly Declaration. The Court refers to this consent order as the December 2006 Consent Order.

Exhibits 2-4 to Deposition of Athena T. Mann, attached as Exhibit B to Plaintiffs' Motion.[12]

Plaintiffs subsequently initiated the instant citizen suits.[13]

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c), Federal Rules of Civil Procedure (Rule(s)), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."

---

[12] As explained below, section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1) "prescribes a 60-day period after notice of a claimed violation of the Act during which a private citizen must refrain from suit, and during which the government exclusively may initiate suit." Am. Canoe Ass'n, Inc. v. City of Attalla, 363 F.3d 1085, 1086 (11th Cir. 2004) (per curiam).

[13] Some, but not all, of the violations alleged in the Complaints were specifically identified in the pre-suit notice.

Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. APPLICABLE LAW

The CWA has a "broad and ambitious" general purpose: "'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" See Friends of the Everglades v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1225 (11th Cir. 2009) (quoting 33 U.S.C. § 1251(a)). To that end, the CWA "bans the 'discharge of any pollutant' without a permit" under the NPDES. Id. at 1216 (citations omitted).[14] This permitting program is the "centerpiece" of the CWA. See id. at 1225. The NPDES "provides that an entity that wishes to discharge pollutants into a particular waterway must obtain a permit from the Administrator of the EPA to do so." Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC, 548 F.3d 986, 989 (11th Cir. 2008) (citation omitted). The CWA "also authorizes the individual states to establish and maintain their own NPDES-permit program so long as it meets the standards set forth in the Clean Water Act and is approved by the Administrator of the EPA." Id.

---

[14]    "'Discharge' is defined as 'any addition of any pollutant to navigable waters from any point source.'" Id. (quoting 33 U.S.C. § 1362 (12)).

(citation omitted).[15] Non-compliance "with the conditions of either the EPA-issued or state-issued NPDES permit can subject a violator to either civil, criminal, or administrative enforcement proceedings and sanctions[,]" and "[v]iolations of state-issued permits can be enforced by either the Federal Administrator of the EPA or the appropriate state authorities." Id. (citations omitted). Absent appropriate state or federal enforcement, the CWA authorizes citizen suits to enforce "violation of either an EPA-issued or state-issued NPDES permit[.]" Id. (citation omitted). To prevail, "the plaintiffs must prove that (1) there has been a discharge; (2) of a pollutant; (3) into waters of the United States; (4) from a point source; (5) without a NPDES permit." Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1008 (11th Cir. 2004) (citations omitted).

## IV.    DEFENDANT'S MOTION

In the instant cases, Plaintiffs allege that Defendant violated the CWA through more than 200 instances of unauthorized discharges of pollutants, in the form of SSOs, at various locations associated with the Buckman System and the Arlington East System. Defendant raises two challenges to this Court's jurisdiction—that Plaintiffs claims are moot and, alternatively, that a private citizen suit is barred by diligent state administrative prosecution. See generally Defendant's Motion. The Court addresses these arguments in turn.

---

[15]    In 1995, Florida applied for, and was granted, authority to administer its own NPDES program. See Sierra Club v. U.S. E.P.A., 377 F. Supp. 2d 1205, 1206 (N.D. Fla. 2005); see also 60 Fed. Reg. 25,718 (May 12, 2995) (approving Florida's NPDES program). Thus, like most states, Florida administers its own NPDES program. See Sierra Club v. Meiburg, 296 F.3d 1021, 1024 & n.2 (11th Cir. 2002) (recognizing that most states administer their own NPDES programs subject to EPA oversight).

**A.    Mootness**

**1.    Applicable Law**

In 1987, the Supreme Court held that the CWA did not confer federal jurisdiction over citizen suits alleging "'wholly past violations'" and that "for purposes of federal court jurisdiction, citizen plaintiffs must 'allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future.'"  See Atl. States Legal Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1133 (11th Cir. 1990) (quoting Gwaltney of Smithfield Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 57 (1987) (Gwaltney I), superceded by statute on other grounds as recognized in Parker, 386 F.3d at 1005).  Thus, it is now well established that "[c]itizens can only bring a citizen suit under the CWA for ongoing or continuous violations, not for those that are wholly in the past." Parker, 386 F.3d at 1009 (citing Gwaltney I, 484 U.S. at 56-63).

However, "plaintiffs need not prove their allegations of ongoing noncompliance before jurisdiction attaches under [the citizen suit provision,] section 505.  Instead, a good faith allegation of violations that continued at the time suit was filed is sufficient for jurisdictional purposes."  Tyson, 897 F.2d at 1133 (citing Gwaltney I, 484 U.S. at 64).  Nevertheless, although plaintiffs need not prove an ongoing violation to invoke jurisdiction, they must ultimately prove an ongoing violation to prevail on the merits.  See Parker, 386 F.3d at 1010 ("To find the defendants liable under the CWA, the jury must have found that there was a continuing violation."); Tyson, 897 F.2d at 1135 ("[T]he showing necessary to maintain a suit for civil penalties must go beyond mere allegations. Plaintiffs must be able to prove that non-compliance was ongoing at the time they filed suit in order to be able to later maintain an

action for civil penalties."); see also Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 521 (4th Cir. 2003) (Murphy Farms I) (recognizing that "[a]s with other jurisdictional matters, the plaintiff's burden to establish an ongoing violation evolves over the course of the litigation"; that "[a]t the motion to dismiss stage, a plaintiff need only have pled facts sufficient to support such a finding"; but, that to survive summary judgment a plaintiff must show either that "the plaintiff is entitled to judgment as a matter of law or that there is a genuine factual dispute and a reasonable jury could find for the plaintiff on the issue" of an ongoing violation).

Importantly, the Supreme Court left traditional principles of mootness undisturbed by its jurisdictional holding in Gwaltney I. See Tyson, 897 F.2d at 1133-34 (citing Gwaltney I, 484 U.S. at 66). In Tyson, the Eleventh Circuit Court of Appeals clarified the approach mandated by Gwaltney I. The court recognized that mootness issues could potentially arise in two distinctly different manners. On the one hand, "if jurisdiction is granted on the basis of the plaintiff's allegations of an ongoing violation, the suit may be dismissed as moot if it turns out later that there was no basis for jurisdiction—i.e., that violations were not in fact ongoing at the time of suit." Id. at 1134. Alternatively, a defendant's post-complaint compliance might invoke mootness principles "when there clearly were ongoing violations . . . at the time suit was filed." Id. The instant Motions require consideration of only the former option. If the case is rendered moot under this option—that is, it turns out that the good faith allegations of ongoing violations were inaccurate, and thus there was no basis for jurisdiction—the suit should be dismissed. See id.

"[F]or purposes of assessing a plaintiff's allegations of ongoing violations, the court must always look to the date the complaint was filed. If on and after that date, the defendants

continued to violate their NPDES permit, then the plaintiffs may request both injunctive relief and civil penalties." Id. at 1134. Alternatively, "[p]laintiffs may also request injunctive relief and penalties if they show a 'continuing likelihood of a recurrence in intermittent or sporadic violations.'" Id. at 1134 n.12 (quoting Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield Ltd., 844 F.2d 170, 172 (4th Cir. 1988) (per curiam) (Gwaltney II). Thus, to survive summary judgement, a plaintiff must demonstrate a genuine issue of material fact sufficient to allow a reasonable jury to find that the plaintiff has satisfied his or her burden of establishing an ongoing violation,[16] a burden that may ultimately be met at trial "'either (1) by proving violations that continue on or after the date the complaint [was] filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.'" Murphy Farms I, 326 F.3d at 521 (quoting Gwaltney II, 844 F.2d at 171-72); see also Tyson, 897 F.2d at 1134-35 & n.12. "Intermittent or sporadic violations do not cease to be ongoing until the date when there is no [reasonable] likelihood of repetition." Gwaltney II, 844 F.2d at 172; see also Gwaltney I, 484 U.S. at 57 ("The most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a

---

[16]     To be sure, a plaintiff need not show anything until the defendant has discharged the initial burden of demonstrating the lack of such a genuine issue of material fact. See Clark, 929 F.2d at 608 ("The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."). Moreover, as with other issues on summary judgment, while the plaintiff bears the ultimate burden at trial of establishing a continuous or intermittent violation, a defendant seeking summary judgment bears the burden of proving that the plaintiff has not raised a genuine issue of material fact for trial. See Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1061 (5th Cir. 1991) ("[T]he defendant has the burden at the summary judgment stage to demonstrate that the plaintiff's allegations of a continuous or intermittent violation do not raise a genuine issue of material fact. If the action proceeds to trial on the merits, however, the plaintiff must prove a continuous or intermittent violation as an element of the plaintiff's cause of action.); see also Gwaltney I, 484 U.S. at 66.

past polluter will continue to pollute in the future."). Accordingly, with respect to the latter method of proof, in determining whether the continuing likelihood of a recurrence in intermittent or sporadic violations constitutes an ongoing violation, a factfinder should consider "whether remedial actions were taken to cure violations, the ex ante probability that such remedial measures would be effective," Gwaltney II, 844 F.2d at 172, and other evidence bearing on whether the risk of defendant's continued violation poses "a reasonable likelihood that a past polluter will continue to pollute in the future." Gwaltney I, 484 U.S. at 57.

### 2.    Analysis

In support of its contention that summary judgment is warranted on the ongoing violation issue, Defendant has submitted an affidavit from Scott Kelly, vice president of water/wastewater systems for JEA, in which Kelly declares that (with the exception of the two SSOs exempted from Defendant's mootness argument), since the time of the Complaints, there have been no new discharges at any of the sites of the SSOs identified in the Complaints and that the cause of each SSO identified in the Complaints was identified and fixed prior to suit. See Kelly Declaration at 12-13. Faced with this affidavit, Plaintiffs must "go beyond the pleadings, and by [their] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery, 64 F.3d at 593-94 (internal citations and quotation marks omitted). Plaintiffs argue that they have done so both by showing post-Complaint violations and by showing that the violations alleged in the Complaints, as intermittent or sporadic violations, were ongoing at the time of filing because there remained a reasonable likelihood

of repetition. See Plaintiffs' Response at 2-4. As explained below, the Court determines that Plaintiff has demonstrated a genuine issue of fact as to whether the violations alleged in the Complaints were intermittent or sporadic and subject to a reasonable likelihood of repetition.[17]

As Plaintiffs correctly note, they need not show post-Complaint acts or discharges, nor must they allege continuous violations, to demonstrate that the violations alleged were ongoing at the time the suits commenced. Rather, because "[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is no [reasonable] likelihood of repetition[,]" a plaintiff may establish an ongoing violation "by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." See Gwaltney II, 844 F.2d at 172; see also Gwaltney I, 484 U.S. at 57; Tyson, 897 F.2d at 1134 & n.12. Notwithstanding Kelly's declaration that the cause of each SSO identified in the Complaints was identified and fixed prior to suit, he acknowledged in his deposition that "the cause [of an SSO] may not even be at the site of the actual overflow." See Kelly Deposition at 38. While "SSOs may result from a variety of causes," see Ziegmont Declaration at 2, JEA has identified "inadequate slope of the sewer lines [a]s the primary cause" of SSOs, see Kelly Deposition at 38. Although JEA has taken steps to reduce the effects of inadequate slope, corrective action remains ongoing and JEA had not—at least as of the time of Kelly's post-complaint deposition—fully corrected this problem or worked around it. See id. at 42-44. As the Eleventh Circuit has emphasized, "for

---

[17]    In light of this conclusion, the Court need not determine whether the twenty-six purported post-Complaint violations, which concern locations in the Buckman and Arlington East systems other than the specific locations of the SSOs identified in the Complaints, present by themselves a genuine issue of material fact as to whether the violations alleged in the Complaints were ongoing at the time the suits commenced.

purposes of assessing a plaintiff's allegations of ongoing violations, the court must always look to the date the complaint was filed." See Tyson, 897 F.2d at 1134.

While JEA contends it has taken significant steps to reduce SSOs, it acknowledges that, at best, its ongoing improvement process has resulted in a downward trend of SSOs, not a fix beyond reasonable probability. See Kelly Declaration at 3-8. Indeed, as Kelly admits, SSOs "are a fact of life." See id. at 5.[18] While "FDEP does recognize that many SSOs are unintentional and are often beyond the control of" JEA, all unplanned wastewater discharges from a treatment facility and all unplanned discharges during transport of wastewater from the treatment facility to the discharge center are considered CWA violations that must be reported to FDEP. See Ziegmont Declaration at 2-3; see also Am. Canoe Assoc., Inc. v. Murphy Farms Inc., 412 F.3d 536, 539-40 (4th Cir. 2005) (Murphy Farms II) (declining to "graft an exemption onto the jurisdictional requirements of section 505(a) to shield from suit those past violators who have undertaken good-faith remedial efforts at the time of the complaint" and noting that "it is plainly possible for those undertaking good-faith remediation . . . nevertheless 'to be in violation' of the Act within the meaning of section 505(a), because the CWA creates a regime of strict liability for violations of its standards") (citation omitted). Thus, the Court finds that Plaintiff has demonstrated a genuine factual dispute as to the "'continuing likelihood of a recurrence'" of intermittent or sporadic SSO violations. See Tyson, 897 F.2d at 1134 n.12 (quotation omitted). Regardless of whether any specific SSO location alleged in the Complaints has been subject to a post-Complaint

---

[18]    Confirmation is apparent in the twenty-six post-Complaint SSOs, even if occurring at locations in the Buckman and Arlington East systems other than the specific locations of the SSOs identified in the Complaints.

SSO recurrence, Plaintiff has demonstrated genuine factual disputes as to whether, although JEA had taken significant remedial measures to reduce SSOs, a reasonable jury could question at the time of the filing of the Complaints "the ex ante probability that such remedial measures would be effective[,]" see Gwaltney II, 844 F.2d at 17, or otherwise find that the incomplete remedial efforts left "a reasonable likelihood that a past polluter will continue to pollute in the future." Gwaltney I, 484 U.S. at 57. Accordingly, the Court determines that JEA's mootness argument for summary judgment is due to be denied.

### B. Diligent Prosecution

### 1. Applicable Law

Although the CWA was originally enacted in 1948, it is the amendments to it in 1972 that "established the regulatory framework that essentially exists today to protect our Nation's waters." Black Warrior Riverkeeper, 548 F.3d at 987-88 (citations omitted). The amended legislation "established a system of effluent limitations, water quality standards, discharge permits, and other regulatory mechanisms to be administered by the federal EPA and the various states in order 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters'" and "enabled a private citizen, for the first time, to bring a civil action in federal court against any person or government that violated the effluent or limitation requirements of the [CWA]." Id. at 988. "The addition of the citizen-suit provision struck a balance between government and private enforcement by allowing citizens to bring suits against polluters, but not when either the federal government through the EPA or a state agency had 'commenced and [was] diligently prosecuting a civil or criminal action' against a polluter in state or federal court." Id. (quotation omitted). In 1987, Congress again amended

the CWA to permit "the EPA and states to assess penalties against polluters not only through existing civil suits or criminal sanctions, but also through a completely new administrative enforcement scheme." Id. Accordingly, "Congress extended the bar against citizen suits when the federal government or a state agency had commenced an enforcement action through the new administrative penalties process." Id.[19] Specifically, under the amended CWA, "[t]he limitation-on-actions provisions bar citizen suits when, under comparable state law, a state has 'commenced and is diligently prosecuting an action'" and "also bar all claims for which 'the State has issued a final order not subject to further judicial review and the violator has paid a penalty under . . . such comparable State law . . . .'" See McAbee v. City of Fort Payne, 318 F.3d 1248, 1250 (11th Cir. 2003) (quoting 33 U.S.C. § 1319(g)(6)(A)(ii)–(iii)). The limitations on actions provisions relevant to the instant action are set fort in subparagraphs (ii) and (iii) of 33 U.S.C. § 1319(g)(6)(A).

**2.  Discussion**

**a.  Subparagraph (iii)**

The Court will first consider the extent, if any, to which § 1319(g)(6)(A)(iii) is applicable to this action. As the Eleventh Circuit Court of Appeals has explained, this section "bars all claims for which 'the State has issued a final order not subject to further judicial review and the violator has paid a penalty under . . . such comparable State law . . . .'" Id. at 1251-52

---

[19]     Nevertheless,

Congress reiterated its commitment to citizen suits, which a Senate Report described as "a proven enforcement tool," by lifting the bar against a citizen suit if either (1) it was filed before any administrative enforcement action commenced or (2) if the citizen had given notice of an intent to sue prior to the commencement of an administrative enforcement action and the suit was actually filed within 120 days of that notice.

Id. (quotation omitted).

(quoting 33 U.S.C. § 1319(g)(6)(A)(iii)).  Plaintiffs do not dispute Defendant's contention that it has paid penalties for certain violations pursuant to final orders not subject to judicial review under state law comparable[20] to its federal counterpart.  See Defendant's Motion at 11-21; see generally Plaintiffs' Response.  Thus, all claims for which Defendant has paid such a penalty are subject to the citizen-suit bar in § 1319(g)(6)(A)(iii).

There is no dispute that Defendant has paid penalties for various SSOs pursuant to four administrative consent orders with FDEP.  The October 2002 Consent Order involved penalties paid for SSOs not included in the Complaints, and thus does not provide a basis for invoking the citizen-suit bar in § 1319(g)(6)(A)(iii); the remaining consent orders, however, are relevant to one or more of Plaintiffs' claims.

In the February 2005 Consent Order, Defendant paid civil penalties in connection with forty-three SSOs in the Arlington East System occurring between September 15, 2001, and February 20, 2004.  See February 2005 Consent Order.  Upon review, the Court notes that forty-one of the forty-three SSOs for which Defendant paid civil penalties in accordance with the February 2005 Consent Order are identified as violations for which Plaintiffs seek relief in the Complaints.  These forty-one SSOs, identified in the Public Trust Complaint as A-1 through A-21, A-23 through A-25, A-27, A-28, A-32, A-33, and A-35 through A-47, are thus subject to the citizen-suit bar in § 1319(g)(6)(A)(iii).  Additionally, in the February 2006 Consent Order, Defendant paid a civil penalty in connection with a single SSO, the same

_____

[20]     Under the comparability analysis crafted by the Eleventh Circuit in McAbee, the Court must analyze the three categories of provisions contained in § 1319(g)(6)—penalty assessment, public participation, and judicial review.  See id. at 1254.  "[F]or state law to be 'comparable,' each class of state-law provisions must be roughly comparable to the corresponding class of federal provisions."  Id. at 1256.

SSO identified in the Public Trust Complaint as A-49. See February 2006 Consent Order. Thus, SSO A-49 is subject to the citizen-suit bar in § 1319(g)(6)(A)(iii). Finally, in the December 2006 Consent Order, Defendant paid a civil penalty in connection with several SSOs, some of which are identified in the Public Trust Complaint as B-22, A-64, B-42, and A-70, and thus subject to the citizen bar of § 1319(g)(6)(A)(iii).[21] As to the remaining claims not subject to the citizen-suit bar under subparagraph (iii), the Court turns to § 1319(g)(6)(A)(ii) to determine the preclusive effect, if any, of the diligent prosecution bar on Plaintiffs' citizen suits.[22]

---

[21]     The December 2006 Consent Order became effective in December of 2006, for a period of three years, unless renewed. The Court has no information as to whether it has expired or been renewed. In addition to assessing civil penalties for prior violations, the December 2006 Consent Order established a stipulated penalty for future SSOs occurring during its effective dates. In lieu of the stipulated penalties, however, the consent order allowed Defendant to "propose an in-kind or pollution prevention penalty project" for FDEP approval, such an in-kind project subject to the requirement that it be "one and a half times any portion of the penalty amount for which [JEA] wishes to offset." See December 2006 Consent Order at 9.
        The Court notes that the following SSOs occurred during the effective period of the December 2006 Consent Order, and were thus, subject to the stipulated penalty provisions of that order: A-86 through A-97, and B-104 through B-110. It is undisputed that rather than pay civil penalties for these SSOs, Defendant complied with FDEP-approved in-kind pollution prevention penalties. See Kelly Deposition at 105-06. Nevertheless, it is unclear which in-kind penalties corresponding to which of these violations have been completed. Thus, the Court determines that these violations are more appropriately resolved pursuant to § 1319(g)(6)(A)(ii)'s diligent prosecution bar.

[22]     In the foregoing analysis, in determining which of the violations alleged by Plaintiffs are subject to the citizen-suit bar under subparagraph (iii), the Court has taken judicial notice of the various streets and roads within the city of Jacksonville, and their locations. In so doing, the Court has determined that although certain of the above-barred violations do not correspond exactly to their counterparts in the respective consent orders, they are in fact the same incidents, with any discrepancy attributable to a mere scrivener's error. As a representative example, the Court has found violation A-38 to be subject to the citizen-suit bar under subparagraph (iii) based on civil penalties paid in connection with the February 2005 Consent Order. The February 2005 Consent Oder reflects payment for an SSO occurring on August 8, 2003, at 4147 Ferber Road. Violation A-38 describes an SSO occurring on the same date at 4147 "Farber" Road. Given that there is no "Farber" Road in Jacksonville, the Court determines that violation A-38 is the same violation addressed in the consent order.
        There are two violations—A-34 and B-34—that appear to correspond to penalties paid in different consent orders. The Court is unable to definitively resolve by judicial notice discrepancies as to these violations, however, and thus the Court determines that these violations are more appropriately resolved pursuant to § 1319(g)(6)(A)(ii)'s diligent prosecution bar.

**b.    Subparagraph (ii)**

Subparagraph (ii) of the CWA's limitations-on-actions provisions, known as the diligent prosecution bar, "bar[s] citizen suits when three requirements are satisfied. First, the state must have 'commenced' an enforcement procedure against the polluter. Second, the state must be 'diligently prosecuting' the enforcement proceedings. Finally, the state's statutory enforcement scheme must be 'comparable' to the federal scheme promulgated in § 1319(g)." McAbee, 318 F.3d at 1251 (internal citations omitted). Plaintiffs do not dispute Defendant's contention that FDEP has commenced[23] enforcement action against JEA under an enforcement scheme comparable[24] to its federal counterpart. See Defendant's Motion at 11-21; Plaintiffs' Response at 12-16. Thus, the only issue presented for the Court is whether the second prong—that "the state must be 'diligently prosecuting' the enforcement proceedings"—is satisfied. See McAbee, 318 F.3d at 1251.

When considering whether the "diligently prosecuting" prong is satisfied, the Court "must afford appropriate deference to the expertise of the agency enforcing the state's environmental laws." See Ark. Wildlife Fed'n v. ICI Americas, Inc., 29 F.3d 376, 380 (8th Cir. 1994) (citation omitted). "Where an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored." N. & S. Rivers Watershed Ass'n, Inc. v. Town of Scituate, 949 F.2d 552, 558 (1st Cir. 1991). Diligence does not require "far-reaching or zealous" prosecution, "[n]or must an

---

[23]    Although the Eleventh Circuit has not "defined what specific acts constitute 'commencement,' . . . most courts that have addressed the issue have concluded that issuance of an administrative consent order . . . would satisfy the 'commencement' requirement." Id. at 1251 n.6 (citation omitted).

[24]    See supra note 20 and accompanying text.

agency's prosecutorial strategy coincide with that of the citizen-plaintiff." See Karr v. Hefner, 475 F.3d 1192, 1197 (10th Cir. 2007).[25]   Second guessing agency assessment of the appropriate remedy "'fails to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has "failed" to do so, not where the EPA [or state agency] has acted but has not acted aggressively enough in the citizens' view.'" Id. (quoting Ellis v. Gallatin Steel Co., 390 F.3d 461, 477 (6th Cir. 2004)).   Thus, federal courts "'ought not to allow'" citizens to seek penalties merely because prior state action "'has not alleged as many separate violations of the Act as has the citizen's suit and therefore seeks to impose a less substantial civil penalty on the defendant.'" Id. (quoting Conn. Fund for Env't v. Contract Plating Co., Inc. 631 F. Supp.  1291, 1293 (D. Conn. 1986)).   "Moreover, an unsatisfactory result does not necessarily imply lack of diligence." Id. (citation omitted).

---

[25]    The Court notes that in Karr the Tenth Circuit considered the diligent prosecution bar in 33 U.S.C. § 1365(b)(1)(B) as opposed to the diligent prosecution bar relevant to the instant case,  33 U.S.C. § 1319(g)(6)(A)(ii).  The former operates when a state initiates judicial proceedings against a polluter, the latter when the state opts for administrative enforcement.  Nevertheless, the Court finds Karr's analysis instructive.

   Indeed, the diligence requirement under § 1365(b)(1)(B) appears to be a more exacting standard than the diligence requirement under § 1319(g)(6)(A)(ii).  Some courts interpreting the diligence standard in  § 1365(b)(1)(B) have held that diligence requires that a "judicial action 'is capable of requiring compliance with the Act and is in good faith calculated to do so[.]'"  See The Piney Run Preservation Ass'n v. The County Comm'rs of Carroll County, 523 F.3d 453, 459 (4th Cir. 2008) (quoting Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist., 382 F.3d 743, 760 (7th Cir. 2004)).  This compliance-capability-requirement flows from the text of § 1365(b)(1)(B).  See Friends of Milwaukee's Rivers, 382 F.3d at 759 ("We look to the language of the Act to find out what is meant by 'diligent prosecution.'  Citizens' suits are barred 'if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order.") (quoting § 1365(b)(1)(B)) (emphasis in Friends of Milwaukee's Rivers).  There is no similar language in  § 1319(g)(6)(A)(ii), however, which simply provides that any violation "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action . . . ."

Deference is particularly important where, as here, the state agency chose to enforce the CWA through a consent order.  See id.  "If a defendant is exposed to a citizen suit whenever the EPA [or state agency] grants it a concession, defendants will have little incentive to negotiate consent decrees."  Id.  Quite simply, "'[a]n Administrator unable to make concessions is unable to obtain them.'"  Id. (quotation omitted); see also Gwaltney I, 484 U.S. at 60-61 ("Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a). Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably.").

Upon review, the Court determines that FDEP has diligently prosecuted administrative enforcement actions against Defendant sufficient to invoke the bar of § 1319(g)(6)(A)(ii).  In a period of less than five years, FDEP has initiated four separate enforcement actions against Defendant in connection with SSOs.  The culminating enforcement action was resolved by a long-term consent order in December 2006.  In the December 2006 Consent Order, the FDEP—which was aware of the various SSOs in the Buckman System, Arlington East System, and other aspects of JEA's wastewater management—penalized JEA for a series of past SSOs and established stipulated penalties for future SSOs, providing that, in lieu of the stipulated penalties, Defendant could "propose an in-kind or pollution prevention penalty project" for FDEP approval, such an in-kind project subject to the requirement that it be "one

and a half times any portion of the penalty amount for which [JEA] wishes to offset." There have been various SSOs since the December 2006 Consent Order took effect—many of which are alleged in the Complaints—and, thus far, rather than pay the stipulated civil penalties, Defendant has complied with FDEP-approved in-kind pollution prevention penalties. See Kelly Deposition at 105-06.[26] Moreover, the FDEP expects Defendant to take reasonable steps to identify and implement system improvements to come into compliance with the CWA. See Strong Declaration at 4. To that end, the December 2006 Consent Order requires Defendant to provide "a written annual progress report" including, without limitation, "a summary of all [JEA]'s unauthorized discharges, a listing of capital projects oriented towards wastewater collection system repair and improvement, prior expenditures on wastewater collection system capital projects, and year-to-date expenditures on wastewater collection system capital projects." See December 2006 Consent Order at 6. In addition to the in-kind projects, JEA also has invested hundreds of millions of dollars in the wastewater treatment systems and has plans in place to upgrade its treatment facilities. See Kelly Declaration at 3. The FDEP and EPA[27] are monitoring these improvements, which have

---

[26]     In so doing, Defendant has incurred costs greater than those of the stipulated civil penalties themselves.

[27]     Although the EPA, unlike the FDEP, has not initiated an enforcement action, in March 2006, the EPA, pursuant to § 308 of the CWA, 33 U.S.C. § 1318, requested detailed information from JEA concerning SSOs. See Kelly Declaration at 11; see also 33 U.S.C. § 1318 ("Whenever required to carry out the objective of" the CWA, "the Administrator shall require the owner or operator of any point source to . . . provide such . . . information as he may reasonably require[.]"). In May 2006, Defendant responded (sending a copy of its response to FDEP, see Strong Declaration at 4), documenting all SSOs during the previous five years, their causes, and corrective efforts and projects. See Kelly Declaration at 11-12.
         On June 28, 2007, the EPA responded, sending Defendant a letter of violation in which it "determined that JEA has violated the Clean Water Act" in connection with "as least 244" SSOs during the period from January 1, 2001, through June 30, 2006. See EPA Letter of Violation, attached as Attachment 11 to Kelly Declaration. The EPA discussed with the FDEP the need for continued
(continued...)

resulted in a downward trend of SSOs since 2002. See Strong Declaration at 4-6. In sum, far from being ignored, the allegations in Plaintiffs' Complaints have been, and remain, subject to diligent oversight, prosecution, and corrective action by the FDEP under the careful review of the EPA.

Because the FDEP "has specifically addressed the concerns of [the] analogous citizen's suit[s], deference to the agency's plan of attack should be particularly favored." N. & S. Rivers Watershed Ass'n, Inc., 949 F.2d at 558. Indeed, "[d]uplicative actions aimed at exacting financial penalties in the name of environmental protection at a time when remedial measures are well underway do not further [the goal of the CWA]. They are, in fact, impediments to environmental remedy efforts." Id. at 556. The mere facts that the FDEP "'has acted but has not acted aggressively enough in the citizens' view[,]'" or that the FDEP "'has not alleged as many separate violations of the Act as has the citizens' suit and therefore seeks to impose a less substantial civil penalty on the defendant[,]" do not suggest a lack of diligence or justify a citizen suit for civil penalties. See Karr, 475 F.3d at 1197 (quotations omitted). Thus, the Court determines that FDEP is diligently prosecuting enforcement proceedings against Defendant. Accordingly, the Court concludes that Plaintiffs' Complaints are subject to the limitation-on-actions bar of § 1319(g)(6)(A)(ii).

---

[27](...continued)
improvements to bring Defendant into compliance with the CWA. See id. To that end, the EPA advised that, although it would not initiate an enforcement action immediately, it would monitor Defendant's "progress in complying with FDEP's [December 2006] Consent Order and progress toward eliminating SSOs[,]" for a period of two years to determine "if future EPA enforcement actions are warranted." See id.

### c.    Scope of Preclusion

Having determined that Plaintiffs' Complaints are subject to the limitation-on-actions bar of § 1319(g)(6)(A)(ii), and that some of the claims are also subject to the bar in § 1319(g)(6)(A)(iii), the Court must consider an issue not addressed by the parties—the extent of the preclusive effect of a bar under § 1319(g)(6)(A).  Specifically, the Court must determine whether the jurisdictional bar applies only to civil penalties or also to equitable relief.  Three circuit courts of appeal have addressed the issue, reaching different interpretations.  The First and Eighth Circuits have held that, where applicable, the bar in § 1319(g)(6)(A)(ii) precludes a citizen plaintiff from seeking not only civil penalty relief, but declaratory and injunctive relief as well.  See Ark. Wildlife Fed'n, 29 F.3d at 383; N. & S. Rivers Watershed Ass'n, Inc., 949 F.2d at 558.  The Tenth Circuit has disagreed, holding that "§ 1319(g)(6)(A)(ii), where it applies, bars only civil penalty claims and not claims requesting declaratory or injunctive relief."  See Paper, Allied-Indust., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co., 428 F.3d 1285, 1300 (10th Cir. 2005).  Because the Eleventh Circuit has not yet addressed the issue, and the parties have not presented their positions, the Court will take the issue under advisement and give the parties an opportunity to fully brief it.

### V.    PLAINTIFFS' MOTION

In Plaintiffs' Motion, Plaintiffs move for summary judgment as to liability with respect to ninety-six of the SSOs alleged in the Complaints and as to six of Defendant's nine affirmative defenses.  See Plaintiffs' Motion at 1-2.  Specifically, Plaintiffs challenge Defendant's affirmative defenses as to wholly past events, mootness, continuing state enforcement, res judicata, statute of limitations, and notice.  See id. at 2.  The first four

affirmative defenses overlap with issues previously discussed in Defendant's Motion, but the final two affirmative defenses present new issues. The Court considers each issue in turn.

### A. Liability

Plaintiffs first request summary judgment as to liability with respect to ninety-six of the SSOs alleged in the Complaints. <u>See</u> Plaintiffs' Motion at 1. To prevail on the merits, Plaintiffs must prove an ongoing or continuing CWA violation. <u>See</u> <u>Parker</u>, 386 F.3d at 1010 ("To find the defendants liable under the CWA, the jury must have found that there was a continuing violation."); <u>Tyson</u>, 897 F.2d at 1135 ("[T]he showing necessary to maintain a suit for civil penalties must go beyond mere allegations. Plaintiffs must be able to <u>prove</u> that non-compliance was ongoing at the time they filed suit in order to be able to later maintain an action for civil penalties."). For the reasons previously discussed, the Court has found a material factual dispute as to whether the SSOs alleged were ongoing at the time Plaintiffs filed suit. Plaintiffs' introduction of a factual dispute sufficient to withstand Defendant's summary judgment motion, however, is a far cry from satisfying the burden necessary to prevail on Plaintiffs' own summary judgment motion. Indeed, the same factual disputes previously identified—whether the cause of any SSO was cured prior to suit or whether there remained a continuing likelihood of a recurrence in intermittent or sporadic violations—preclude entry of summary judgment for Plaintiffs just as it did for Defendant.

**B.    Affirmative Defenses**

**1.    Wholly Past Events and Mootness**

For the reasons previously discussed, the Court finds material factual disputes as to whether Plaintiffs' allegations concern ongoing violations or wholly past events.  Thus, Plaintiffs' summary judgment request as to the affirmative defenses of wholly past events and mootness is due to be denied.

**2.    Continuing State Action and Res Judicata**

As previously discussed, diligent state prosecution of an administrative enforcement action precludes Plaintiffs' suits for civil penalties, but the Court has requested additional briefing from the parties as to whether equitable relief is also barred.  Thus, the summary judgment request as to the affirmative defenses of continuing state action and res judicata is due to be taken under advisement.

**3.    Statute of Limitations**

Plaintiffs next request summary judgment as to Defendant's statute of limitations affirmative defense.  "Because the CWA does not specify a limitations period for enforcement actions . . . the default limitations provisions of 28 U.S.C. § 2462 apply to the government's actions for civil fines or penalties."  United States v. Banks, 115 F.3d 916, 918 (11th Cir. 1997).  Most courts to consider the statute of limitations in the context of a CWA citizen suit have declined to borrow state limitation periods, holding instead that § 2462 applies to citizen

suits as well.[28]  See e.g., Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 73-76 (3d Cir. 1990); Sierra Club v. Chevron U.S.A., Inc., 834 F.2d 1517, 1521 (9th Cir. 1987).  Section 2462 provides a default five-year limitation period for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise."  As the Eleventh Circuit has held, "[t]he plain language of section 2462 does not apply to equitable remedies."  See Banks, 115 F.3d at 919 (citation omitted). The Court has taken under advisement the issue of whether Plaintiffs are barred from seeking equitable relief, but the Court has determined that, at a minimum, Plaintiffs' actions for civil penalties are barred.  Thus, the Court need not undertake any additional analysis with respect to the statute of limitations, because it has no bearing on the remaining issue of equitable relief.[29]

### 4.    Notice

Plaintiffs finally request summary judgment as to Defendant's affirmative defense that certain of the violations alleged in the Complaints are subject to dismissal for lack of pre-suit notice. See Plaintiffs' Motion at 11-14.  Section 505(b)(1) of the CWA, 33 U.S.C. § 1365(b)(1) "prescribes a 60-day period after notice of a claimed violation of the Act during which a

---

[28]    Defendant's affirmative defense specifically references § 2462, and the parties have each briefed § 2462 as the applicable statute of limitations.  See Plaintiffs' Motion at 14-16; Defendant's Response at 16.

[29]    The Court notes that the parties are in apparent agreement that the statute of limitations with respect to a continuing CWA violation does not begin to run until the violation is fully remedied.  See Plaintiffs' Motion at 15; Defendant's Response at 16.  The Court confesses confusion as to how to apply this standard to a citizen suit, because a violation must be ongoing at the time of suit.  Thus, as briefed by the parties, it appears to the Court that no viable citizen suit could be subject to the limitations period in section 2462.  Nevertheless, the Court need not determine whether the parties have properly applied section 2462 because, as explained, it plainly does not bar Plaintiffs' equitable claims, if those claims otherwise survive.

private citizen must refrain from suit, and during which the government exclusively may initiate suit." Am. Canoe Ass'n, Inc. v. City of Attalla, 363 F.3d 1085, 1086 (11th Cir. 2004) (per curiam). "[T]he 60-day notice requirement of 33 U.S.C. § 1365(b) is a mandatory condition precedent to the filing of a citizen suit under the [CWA]. If a plaintiff fails to comply with this notice requirement where it is applicable, the district court is required to dismiss the action." Nat'l Envtl. Found. v. ABC Rail Corp., 926 F.2d 1096, 1097-98 (11th Cir. 1991).[30] The notice requirement is designed to "give the alleged violator an opportunity to bring itself into compliance with the Act, and thus make the citizen suit unnecessary" and "to effectuate Congress's preference that the Act be enforced by governmental prosecution." Id. at 1099.

In the instant Complaints, Plaintiffs allege CWA violations in the form of 110 Buckman System SSOs and ninety-five Arlington East System SSOs. There is no dispute that Plaintiffs sent Defendant a pre-suit notice letter that specifically identified some, but not all, of these violations. The issue for the Court is the extent, if at all, specific SSOs not identified in Plaintiffs' notice are justiciable. Plaintiffs argue that the CWA does not require pre-suit notice to specifically identify each SSO and that the instant pre-suit notice was sufficient to cover all violations alleged in the Complaints. See Plaintiffs' Motion at 11-14. Defendant argues that any violation not specifically identified was not properly noticed. Under this rubric, Defendant contends that neither Riverkeeper nor Public Trust provided proper notice as to ninety-seven of the 110 Buckman System SSOs, and that Riverkeeper also failed to properly notice fifty-three of the ninety-five Arlington System SSOs See Defendant's Motion at 13.

_____

[30] The mandatory notice requirement is subject to two exemptions inapplicable to the instant case. See id. at 1098.

In Pub. Interest Group of N.J., Inc. v. Hercules, Inc., 50 F.3d 1239 (3d Cir. 1995), the Third Circuit became the first circuit court of appeal to consider the precise issue here presented—the adequacy of pre-suit notice failing to specifically identify additional violations later alleged in a citizen-suit complaint. See id. at 1241, 1247-50. The Hercules court did "not read § 1365 to compel a finding that a citizen must give notice to recipients of each individual violation of a specific discharge limitation." Id. at 1248. As the court explained,

> if a permit holder has discharged pollutant "x" in excess of the permitted effluent limit five times in a month but the citizen has learned only of four violations, the citizen will give notice of the four violations of which the citizen then has knowledge but should be able to include the fifth violation in the suit when it is discovered. Whether the agency or the permit holder is informed of four or five excess discharges of pollutant "x" will probably make no difference in a decision to bring about compliance. If the agency or the permit holder decides, however, not to comply, there seems to be nothing gained by requiring the citizen to file a new notice letter in order to include a fifth violation in the suit. A literal reading of the statute requires that the citizen identify discharges in excess of the effluent limit, but not necessarily each individual excess.

Id. Thus, the court judged the sufficiency of the pre-suit notice in terms of whether it accomplished the intended purpose of such notice—that is, whether it provided "the EPA and the state . . . with enough information to enable them intelligently to decide whether to" initiate an enforcement action and provided "the alleged violator . . . with enough information to be able to bring itself into compliance." Id. at 1249. Applying its test, the court held "that a notice letter which includes a list of discharge violations, by parameter, provides sufficient information for the recipients of the notice to identify violations of the same type (same parameter, same outfall) occurring during and after the period covered by the notice letter." Id. at 1250.

In addition to being urged as the appropriate standard by all parties in this case, see Plaintiffs' Motion at 13-14; Defendant's Response at 14-15, the Third Circuit's approach has also proved persuasive to other courts of appeal, see Comty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy, 305 F.3d 943, 950-953 (9th Cir. 2002) (citing Hercules extensively and holding notice adequate despite fact that "the plaintiffs' complaint listed violations that were not specifically listed in the notice" because "the violations originated from the same source, were of the same nature, and were easily identifiable" and "[a]s in Hercules, [the plaintiff's] notice satisfie[d] the goals of the CWA's citizen suit provision"); Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351, 355 (8th Cir. 1998) (citing Hercules and holding that "[a] citizen suit is limited to violations that are closely related to and of the same type as the violations specified in the notice of intent to sue.").

In the instant case, although the parties have advanced the Third Circuit's violation-by-violation approach, they respectively advocate for an all-or-nothing end result. Upon review, the Court is presently unable to agree entirely with either position. On the one hand, given the myriad causes, locations, and impacts of SSOs, the Court views with skepticism Plaintiffs' broad assertion that their pre-suit letters properly notified Defendant of all the various SSOs, regardless of cause or location, that occurred over the course of several years throughout the thousands of miles of piping associated with the Buckman System and Arlington East System. Nevertheless, the Court also views with skepticism Defendant's contention that there is no overlap, and that among the SSOs not specifically identified, not one was of the same type as a specifically identified SSO. It seems possible that some, even if not all, of the SSOs alleged in the Complaints but not specifically noticed could have been of the same

type, as contemplated by <u>Hercules</u>, as those SSOs that were specifically identified. Rather than sift through the record unguided in such an endeavor, the Court is of the view that the most appropriate course of action is to take the pre-suit notice issues (both as raised by Defendant in its Motion and Plaintiffs in their Motion) under advisement to allow the parties to substantiate their arguments as to which violations were properly noticed pre-suit.

## VI. CONCLUSION

In light of the foregoing, the Court determines that each Motion is due to be granted, in part, denied, in part, and taken under advisement, in part, as follows:

With respect to Defendant's Motion, the Court will deny the general request to find Plaintiffs' claims moot for lack of an ongoing violation; will grant the request to find Plaintiffs' claims subject to the limitation bar in § 1319(g)(6)(A)(ii) and/or (iii); and will take under advisement the scope of the preclusive effect of these limitations, specifically, whether Plaintiffs are barred from seeking civil penalties and equitable relief, or merely barred from seeking civil penalties.

With respect to Plaintiffs' Motion, the Court will deny the summary judgment request as to liability; will deny the summary judgment request as to the affirmative defenses of wholly past events and mootness; will grant the summary judgment request at to the affirmative defense of statute of limitations; and will take under advisement the summary judgment request as to the affirmative defenses of continuing state action, res judicata, and notice.

Finally, because the issues taken under advisement may impact the proper resolution of the two SSO locations separately argued in Defendant's Motion, the Court will also take

under advisement the treatment of those SSOs occurring at 10477 Bradley Road and at 3254 Townsend Boulevard.

As to those issues taken under advisement by the Court, the parties[31] may file a supplemental brief, not to exceed 20 pages, addressing the issues outlined herein on or before April 1, 2010.

Accordingly, it is **ORDERED**:

1. Defendant's Motions (Doc. No. 9 and Doc. No. 15, Case No. 3:07-cv-747-J-34MCR) are **GRANTED, in part, DENIED, in part, and TAKEN UNDER ADVISEMENT, in part**, as follows:

   A. Defendant's Motions are **GRANTED** to the following extent:

      i. The SSOs identified in the Public Trust Complaint as A-1 through A-21, A-23 through A-25, A-27, A-28, A-32, A-33, A-35 through A-47, A-49, B-22, A-64, B-42, and A-70, are all subject to the citizen-suit bar of §1319(g)(6)(A)(iii).

      ii. Plaintiffs' Complaints are subject to the limitation-on-actions bar of § 1319(g)(6)(A)(ii).

---

[31] Unless prior cause is shown and an appropriate motion filed, Plaintiffs should file a single consolidated supplemental brief.

B. Defendant's Motions are **DENIED** to the extent that the Court will not grant summary judgment in favor of Defendant on the basis that Plaintiffs' claims are moot for lack of an ongoing violation.[32]

C. In all other respects, Defendant's Motions are **TAKEN UNDER ADVISEMENT**.

2. Plaintiffs' Motion (Doc. No. 32) is **GRANTED, in part, DENIED, in part, and TAKEN UNDER ADVISEMENT, in part**, as follows:

A. Plaintiffs' Motion is **GRANTED** to the extent that the Court determines that Defendant's statute of limitations affirmative defense is no longer applicable to this action.

B. Plaintiffs' Motion is **DENIED** to the extent that the Court will not grant summary judgment in favor of Plaintiff on the issue of liability or as to Defendant's affirmative defenses for wholly past events and mootness.

C. In all other respects, Plaintiffs' Motion is **TAKEN UNDER ADVISEMENT**.

3. Consistent with the directives of this Order, on or before **APRIL 1, 2010**, Plaintiffs and Defendant shall file a supplemental brief, not to exceed 20 pages.

---

[32] This decretal applies to SSOs alleged to have occurred at locations other than 10477 Bradley Road and 3254 Townsend Boulevard. All issues with respect to SSOs alleged to have occurred at those two locations are **TAKEN UNDER ADVISEMENT**.

4.      This matter is set for a motion hearing on Plaintiffs' Motion and Defendant's Motions, to the extent taken under advisement, before the undersigned on **TUESDAY, APRIL 27, 2010, at 10:00 A.M.**, at the United States Courthouse, 300 North Hogan Street, Courtroom No. 10B, Tenth Floor, Jacksonville, Florida.[33]

5.      To the extent taken under advisement, the Court will **DEFER** ruling on Plaintiffs' Motion and Defendant's Motions pending completion of supplemental briefing and oral argument.

**DONE AND ORDERED** at Jacksonville, Florida, this 1st day of March, 2010.

_Marcia Morales Howard_
**MARCIA MORALES HOWARD**
United States District Judge

lc9

Copies to:

Counsel of Record

---

[33]      The parties are reminded that photo identification is required to enter the United States Courthouse. In addition, cellular telephones and laptop computers are prohibited in the Courthouse.